857 So.2d 110 (2001)
F.P. and R.P.
v.
J.K.M. and S.L.M.
2991374.
Court of Civil Appeals of Alabama.
August 31, 2001.
*111 Amardo Wesley Pitters, Montgomery, for appellants.
John A. Nichols of Lightfoot & Nichols, Luverne, for appellees.
THOMPSON, Judge.
F.P. and R.P. (the "paternal grandmother") appeal from a judgment that denied their joint petition for custody of F.P.'s minor child, terminated his parental rights to the child, and approved the adoption of the child by J.K.M. and S.L.M. (the "adoptive parents").
On July 1, 1999, F.P. petitioned the juvenile court for a determination that he was the father of the child and for a stay of adoption proceedings that he said he believed were pending in the Crenshaw County Probate Court.
On July 12, 1999, the adoptive parents filed in the probate court a petition to adopt the child. On July 13, 1999, the probate court entered an interlocutory order awarding custody of the child to the adoptive parents, pending a dispositional hearing scheduled for December 1999.
In December 1999, F.P. filed a second motion in the juvenile court seeking to have his paternity of the child judicially determined; F.P. stated in that motion that paternity tests had established his paternity of the child. On January 5, 2000, the trial court entered an order determining him to be the biological father of the child. However, on January 19, 2000, the trial court, apparently ex mero motu, entered an order in which it set aside its January 5, 2000, order and scheduled a hearing to consider the issue of the paternity of the child.
On April 10, 2000, F.P. filed in the probate court a motion seeking to set aside the adoption proceedings and the order awarding the adoptive parents custody of the child. On April 20, 2000, the probate court transferred the pending adoption action to the juvenile court.
*112 Also on April 10, 2000, F.P. and the paternal grandmother filed in the juvenile court an "amended petition for custody," in which they sought joint custody of the child. On April 14, 2000, the adoptive parents petitioned to terminate F.P.'s parental rights.
The juvenile court (hereinafter the "trial court") conducted an ore tenus hearing on April 28, 2000. On September 8, 2000, the trial court entered a judgment that, among other things, terminated F.P.'s parental rights, denied F.P. and the paternal grandmother's joint petition for custody of the child, and granted the adoptive parents' petition to adopt the child. F.P. and the paternal grandmother appealed.
The facts are as follows: The minor child, who was born on July 6, 1999, is biracial. B.S., the child's mother, and F.P. were both 17 years old and attended the same high school at the time of the child's birth. The mother and F.P. had dated while in high school, but they were unable to date "openly" because the mother's family did not approve of the relationship. The mother testified that her mother had asked her to leave home after she became pregnant, at least in part because she had become pregnant by a person of another race.
The mother testified that in October 1998 she told F.P. that she was pregnant and that after that she and F.P. did not continue to date. The mother testified that she "[did not] know" what happened to the relationship, only that, after she informed F.P. of her pregnancy, "[they] just stopped seeing each other." It is undisputed that after learning of the mother's pregnancy, F.P. offered the mother no emotional or financial support and made no effort to contact her.
The paternal grandmother took the mother to two prenatal medical appointments. The mother testified that, at the paternal grandmother's request, she wrote a letter stating that she wanted the paternal grandmother to have custody of the baby after it was born. The mother testified at the April 2000 hearing that she thought the child's best interests would be served by living with the adoptive parents.
At the time of the hearing, F.P. was attending college 150 miles from his family's home and had a part-time job at which he earned $300 per month. He testified that his mother provided the majority of his support. He returns to his mother's home on weekends.
F.P. testified that he had never seen the child. He and the paternal grandmother went to the hospital to visit the child after its birth. The paternal grandmother testified that they were unable to see the child because the child was not "available" because he had just been returned to the nursery. F.P. testified that he made no further attempt to see or visit the child, and he did not ask the mother about the child. When asked why he did not attempt to see, or inquire about, the child, F.P. responded by saying he "[did not] know."
The adoptive parents took the child home from the hospital. F.P. testified that he first learned three weeks after the child's birth that the mother did not have custody of the child. F.P. testified that another two weeks passed before he spoke with the mother about the child; he admitted that the mother had contacted him on that occasion.
The adoptive parents' home address is listed in the petition for adoption. Other information, such as their home and work telephone numbers and directions to their home, is contained in the documents filed in support of the adoption petition. Although F.P. admitted that he knows the name of the Florida town in which the *113 adoptive parents and the child live, he testified he does not know where in Florida that town is located.
Further, F.P. made no attempt to contact the adoptive parents until the Saturday before the hearing. At that time, he telephoned the adoptive parents' home and spoke to a relative who was babysitting the child. F.P. testified he asked the relative if he could come see the child, and the relative answered "no." F.P. testified that he made no further attempt to contact the adoptive parents, and, when asked why he did not call back to speak with the adoptive parents, he responded, "I don't know."
F.P. testified that he did not provide support for the mother during the pregnancy because she did not ask for support; he also testified that he had not provided any support during the time the child has been in the custody of the adoptive family because the adoptive family did not request such support. We note that at no time during his contest of the adoption proceedings did F.P. ask a court to determine a child-support obligation or make an offer to pay some amount of child support into the court. The mother and the adoptive parents have been the sole providers of support for the child.
F.P. has another child by his current, 16-year-old girlfriend. He stated that he was providing financial and emotional support for the mother of that child. The mother of that child testified that F.P. gave her money "if I needed it," but she admitted on cross-examination that F.P. had not given her as much as $50 in support for her child.
F.P. testified that he wanted custody of the child "[b]ecause he is my son. I do not want anyone else raising him. I think it is in [the child's] best interests [that] he be with his natural father, not someone else." However, it is undisputed that F.P. wants the child to live with the paternal grandmother while F.P. attends college in a town over 150 miles from his mother's home. F.P. testified that if he had the child he would see the child on weekends. The paternal grandmother's sister and a cousin testified that, if F.P. was awarded custody of the child, they were willing to care for the child while the paternal grandmother worked.
The paternal grandmother testified that she would like to have custody of the child, and, in the alternative, that she would take care of the child for F.P. while he attends college. The paternal grandmother testified that she works, but that one of her cousins or a neighbor could take care of the child during the day while she is at work. Both the cousin and the neighbor testified they were willing to care for the child while the paternal grandmother was at work. F.P.'s siblings testified that they were willing to support F.P. financially and assist him with the child; they did not seek custody or offer to take the child.
Teresa Saunders, a social worker for the Department of Human Resources, testified that the probate court asked her to complete a report in conjunction with the petition for adoption. Saunders testified that she was asked to obtain information regarding the medical and social histories of the child's natural parents. Saunders testified that she interviewed the mother and obtained the requested information from her, but that the mother informed her that she did not know the whereabouts of the child's father.
Sandra Walker, a clinical specialist who counseled the mother during her pregnancy, testified that she had known the mother for all of the mother's life and that she had known F.P. during his "school career." Walker testified that she counseled the mother during her pregnancy while the mother considered her available options. *114 Walker was the mother's counselor; therefore, she testified, it was not appropriate for her to attempt to counsel F.P.
Walker facilitated the adoption of the child through the Christian Adoption Agency. Walker testified that she did not consider F.P. or his family for an adoptive placement for the child because she believed F.P. had rejected both the mother and the baby. The mother reported to Walker that F.P. had rejected her, and Walker had witnessed an incident in which she said F.P. had rejected and "shunned" the mother.
Walker also testified that in spring 1999, before the birth of the child, the mother, her mother and uncle, F.P., the paternal grandmother, and the parties' attorneys met with her and a representative of the adoption agency to discuss the mother's plan to place the child for adoption. Walker testified that neither F.P. nor his mother indicated that his family should be explored as a possible placement for the child; that nobody at the meeting raised an issue as to whether the adoption should proceed; and that after the meeting, she believed she had no reason to discontinue the adoption process.
The adoptive parents each testified that they had a loving relationship with the child. They described their home, their financial ability to care for the child, and the support they receive from their friends and the members of their church.
The trial court's judgment stated, in part:
"The Court having considered all of the evidence presented ore tenus, arguments of counsel, and having read and studied briefs filed on behalf of [the adoptive parents] and [F.P.], having consulted in chambers with the guardians ad litem for the minor child and both minor parents, and subsequent thereto having consulted in chambers with the guardian ad litem for the child, the Court is satisfied from clear and convincing evidence adduced that the facts alleged in the petition for adoption are true; that the adoptee has been in the actual physical custody of the petitioners for a period of sixty (60) days or more; that the petitioners are suitable to be the parents of said adoptee and that they desire to establish a parent/child relationship with the adoptee; that the evidence clearly supports [a finding] that [F.P.] has impliedly consented or relinquished his parental rights pursuant to Section 26-10A-9, Ala.Code 1975, and further that his parental rights should be terminated pursuant to Section 26-18-7, Ala.Code 1975; that the best interest of the adoptee will be served by granting the petition to adopt, and that a change of name of the adoptee and a change of guardianship to the [adoptive parents] is proper."
On appeal, F.P. first argues that the trial court erred in determining that he had impliedly consented to the adoption of the child. Section 26-10A-9, Ala.Code 1975, governs implied consent to an adoption or voluntary relinquishment for adoption.
"A consent or relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent:
"(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.
"(2) Leaving the adoptee without provision for his or her identification for a period of 30 days.
"(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not *115 otherwise maintaining a significant parental relationship with the adoptee for a period of six months.
"(4) Receiving notification of the pendency of the adoption proceeding under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days."
§ 26-10A-9, Ala.Code 1975.[1]
The appellants argue that, because F.P.'s paternity was not established before the child's birth, he was not a "parent" of the child who owed any rights or duties to the child, and therefore, that his prebirth conduct toward the child's mother could not constitute implied consent to the adoption pursuant to § 26-10A-9, Ala.Code 1975. We cannot agree. Further, the appellants did not raise this issue before the trial court. An appellant may not raise an issue for the first time on appeal; this court may not consider a theory or issue not pleaded or argued before the trial court. Abbott v. Hurst, 643 So.2d 589 (Ala.1994); Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313 (Ala.1992); Smith v. Equifax Servs., Inc., 537 So.2d 463 (Ala.1988). F.P. has not demonstrated that the trial court erred in its application of § 26-10A-9, Ala.Code 1975.
The next issue raised in the appellants' brief on appeal is whether the evidence in the record supports the trial court's termination of F.P.'s parental rights. The trial court's finding that F.P.'s conduct amounted to an implied consent to the adoption, pursuant to § 26-10A-9, Ala.Code 1975, is sufficient to support the judgment approving the adoption, see §§ 26-10A-7 and -9, Ala.Code 1975, and we affirm the judgment on that basis. However, out of an abundance of caution, we address F.P.'s argument regarding the termination of his parental rights pursuant to § 26-18-7, Ala.Code 1975.
Every parent has a prima facie right to custody of his or her child, and that right can be overcome only by a showing of clear and convincing evidence indicating that removing the child from the parent's custody would be in the best interests of the child. M.H.S. v. State Dep't of Human Res., 636 So.2d 419 (Ala.Civ.App.1994). On appeal, the trial court's termination of a parent's parental rights is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. Id. The paramount consideration in a proceeding to terminate parental rights is the best interests of the children involved. A.R.E. v. E.S.W., 702 So.2d 138 (Ala.Civ.App.1997).
In its judgment, the trial court stated that it found, through clear and convincing evidence, that F.P.'s parental rights should be terminated pursuant to § 26-18-7, Ala.Code 1975. That section reads:
"Grounds for termination of parental rights; factors considered; presumption arising from abandonment.

"(a) If the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the *116 parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for the needs of the child;
"(3) That the parent has tortured, abused, cruelly beaten or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling;
"(4) Conviction of and imprisonment for a felony;
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent;
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"[certain named offenses]
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
"(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period."
§ 26-18-7, Ala.Code 1975.
The evidence in the record makes it clear that F.P. provided the mother of his *117 child no emotional, financial, or other form of support during her pregnancy. He attended a meeting at which the mother's plan to place the child for adoption was discussed; Walker (the counselor) testified that neither F.P. nor any member of his family objected at that meeting to placing the child for adoption. After the child was born, F.P. made no inquiries about the child. He testified that he first learned, three weeks after the child's birth, that the child was with the adoptive parents and that he obtained that information from his mother. The adoption petition contained all necessary identifying and contact information regarding the adoptive parents. F.P. made no effort to contact the adoptive parents. He answered "I don't know" when asked why he had made no effort to inquire about the child or to contact the adoptive parents. The appellants state in their brief on appeal that the adoptive parents "prevented" F.P. from developing a relationship with his son. The record does not support that assertion. Since July 12, 1999, F.P. has had all of the information necessary to contact the adoptive parents regarding the child. F.P.'s first attempt to contact the adoptive parents occurred on the Saturday before the April 28, 2000, hearing in this matter. As a result of F.P.'s attempt to contact them immediately before the hearing, the adoptive parents asked their attorney to send F.P.'s attorney a letter indicating that they "would prefer" not to have contact with F.P.; their attorney sent such a letter, dated April 25, 2000three days before the hearing in this matter. It cannot be said that that letter prevented F.P. from making an attempt to contact the adoptive family during the 10 months in which the child was in their custody before F.P. made his only effort to contact them. We note that the adoptive parents testified that they were willing to have future contact with the mother, but that, because F.P. was contesting their adoption of the child, they were unsure whether they wanted to have contact with him in the future.
In his brief to this court, F.P. attributes his failure to offer any support for the child to his "poverty." He cites In re Hickman, 489 So.2d 601 (Ala.Civ.App.1986), for the proposition that in the absence of abuse or a lack of caring, poverty is not a reason to take a child from his parents. However, at trial, F.P. did not state that he was unable to provide support for the child. He testified that he did not provide any support to the child's mother because, he says, she did not ask for any support. He testified that if he had had an "open relationship" with the adoptive parents, then he would have offered and provided support for his child. However, F.P. made no effort to seek any relationship with the adoptive parents, until only days before the hearing. During his only attempt to contact the adoptive parents, F.P. spoke with a relative who he believed was just a babysitter; F.P. made no additional effort to contact, or to speak with, the adoptive parents.
Further, F.P. sought custody of the child, but stated that if awarded custody, the child would not live with him, but, rather, would be reared by F.P.'s family while F.P. continues his college education in a town 150 miles from his family's home. The record clearly demonstrates that F.P. has made no effort to adjust any aspect of his life to accommodate the needs of the child.
In his brief on appeal, F.P. discusses the questions whether the court had viable alternatives to the termination of his parental rights, by stating only that "he has presented the court with viable alternatives to his son being adopted, namely that of having his entire family['s] support pending his completion of college." Thus, *118 F.P. argues on appeal only that an award of custody to him is the viable alternative to the termination of his parental rights.
We conclude that the record demonstrates that F.P.'s conduct amounted to an abandonment of the child and that his conduct toward the child, both before and after its birth, contradicts the position he has taken in this legal proceeding. The record also demonstrates that F.P. had failed to offer any form of support for the child, and that he had failed to maintain any contact, or to seek visitation with, the child. See § 26-18-7, Ala.Code 1975.
We conclude that the trial court's judgment is supported by the evidence in the record and that the judgment is not plainly and palpably wrong. See A.R.E. v. E.S.W., supra; M.H.S. v. State Dep't of Human Res., supra. The judgment is affirmed.
AFFIRMED.
PITTMAN, J., concurs.
MURDOCK, J., concurs in the result.
YATES, P.J., and CRAWLEY, J., dissent.
YATES, Presiding Judge, dissenting.
I respectfully dissent from the main opinion affirming the trial court's judgment terminating the father's parental rights and approving the adoption of his minor child. The evidence does not support a finding that the father gave implied consent to the adoption or that his actions amounted to an abandonment of the child. To the contrary, the evidence supports a finding that the father has vigilantly pursued his legal rights to establish a relationship with the child and has sought legal and physical custody of the child. Further, on the basis of our supreme court's recent ruling in Ex parte C.V., 810 So.2d 700 (Ala.2001) (reversing the trial court's judgment terminating a father's parental rights and approving an adoption based on implied consent), the evidence in this case, likewise, "does not tend to prove any of Alabama's applicable statutory criteria for terminating the father's parental rights." 810 So.2d at 702.
I am reciting the procedural history and the facts to present my rationale for disagreeing with the main opinion. On July 1, 1999, the father petitioned the juvenile court for a determination of "father and child relationship," alleging that on or about June 29, 1999, "the mother" had given birth to a child he believed might be his biological child;[2] that he had registered with the putative-father registry, § 26-10C-1, Ala.Code 1975; that he believed an adoption proceeding was pending in the Crenshaw County Probate Court; that he was requesting a blood test to determine paternity; and that he was requesting a stay of any pending adoption proceedings involving the minor child.
On July 12, 1999, the adoptive parents petitioned the probate court for adoption, alleging that the child, born on July 6, 1999, was in the mother's custody and that "no other persons or agencies have any interest" in the child; that "all persons known to the [adoptive parents] at the time of filing this petition from whom consents or relinquishments to this adoption are required by law ... are as follows: [the mother]"; and that they were fit and proper persons to adopt the child. On July 13, 1999, the probate court entered an interlocutory judgment, awarding the adoptive parents custody of the child, ordering a postplacement investigation, and *119 setting the case for a dispositional hearing in December 1999.
In December 1999, F.P. moved for a judicial determination adjudicating him as the father, to allow him to pursue further legal action regarding the child. F.P. argued that a paternity test had indicated his probability of paternity at 99.99%. According to the case action summary, the court, on January 5, 2000, determined that, based on the result of the blood test, F.P. was the father of the child; however, on January 19, 2000, the court withdrew its order, stating, "[T]he order of January 5, 2000, is hereby set aside and a hearing is set for February 11, 2000, to determine paternity."
On April 10, 2000, the father moved the probate court to dismiss the adoption proceedings, to set aside the probate court's interlocutory order, and to order the adoptive parents to "immediately turn over custody of the minor child" to him. He argued that his paternity had been established pursuant to § 26-17-12, Ala.Code 1975; that he did not consent to the adoption pursuant to § 26-10A-7, Ala.Code 1975; that he had not been declared unfit and his parental rights had not been terminated; and that he was willing and able to care for the minor child. After the adoptive parents moved to transfer the adoption proceeding, the probate court, on April 20, 2000, entered an order transferring the adoption case to the juvenile court.
On April 10, 2000, the father amended his petition for custody, seeking joint custody of the child with his mother. On April 14, 2000, the adoptive parents petitioned to terminate the father's parental rights, alleging that the mother had consented to the adoption, that the father was not a fit and proper person to have parental rights, and that it would be in the child's best interests to terminate the father's parental rights.
After conducting an ore tenus proceeding, the court, on September 8, 2000, entered an order finding that the father had "impliedly consented" to adoption or had "relinquished" his claim to custody, § 26-10A-2(4) and (13); terminating his parental rights, in reliance on § 26-10A-7, Ala.Code 1975; and granting the adoption of the minor child by the adoptive parents.
The pertinent facts of this case are as follows: The minor child is biracial. The mother and father were both 17 years old and were attending high school in a small town at the time of the child's birth. The mother testified that after she became pregnant she was told to leave her mother's residence. She said that she thought the reason she was told to leave was because she had become pregnant by a person of another race. The mother and father testified that they had dated during high school; however, according to the father, they did not date openly because the mother's family did not approve. The mother testified that after she became pregnant she and the father "stopped having contact," but that she maintained contact with his mother. Both the mother and the paternal grandmother stated that the paternal grandmother drove her to several doctor's visits for prenatal care, and the mother admitted that she had written a letter stating that she wanted the paternal grandmother to have custody of the child. She stated that she had been confused throughout the decision-making process and that she did not know what was the best decision for the child. When questioned by the court as to what she thought was in the best interest of her child, she stated that she thought the child would be "best off" with the adoptive parents because they were a two-parent *120 household and could provide for the child financially.
The father was attending college and working part-time at the time of the trial. He stated that he returned to his home on the weekends. He said that he had never seen his son. The paternal grandmother said that she (the grandmother), F.P., and the grandmother's daughter had attempted to visit the child when it was born and were told that they could not see the child without the mother's permission and were refused the visit. The father stated that he did not have any information on the adoptive parents other than a telephone number and that he had tried to reach them by telephone one week before the date of the trial. He said that he had never consented to the child's adoption and that the mother had stated that she had been pressured into consenting to an adoption because the child was biracial. He stated that he wanted the child to be with his natural family regardless of the child's race and that through his family's support he would be able to provide for the child while he attended college. He stated that he had also fathered a child with his current 16-year-old girlfriend and that he was providing emotional and financial support to that mother and child. He said that he had never been convicted of any crimes; however, he admitted that he had been suspended from high school for "passing a marijuana cigarette" in the school bathroom.
The father's witnesses included three siblings, who stated that they would assist him financially to support the child while he completed his college education; the paternal grandmother, who stated that she would care for the child in her home and wanted joint custody of the child; and two paternal aunts, who were retired, and who stated that they would provide child care. The judge stated in open court that each of the witnesses was capable of providing for the child.
The adoptive parents both testified as to the loving relationship they had developed with the child and their financial ability to provide for the child. The adoptive father stated that he felt any communication from the father requesting to see the child would be considered "harassing calls" and that he had not extended the same option to the father as to the mother to see the child, because the father was trying to prevent the adoption.
Teresa Sanders, a Department of Human Resources ("DHR") caseworker, testified that the mother had told her about the father; however, she prepared the adoption documents without stating the father's name, because, according to her, the mother said she "didn't know his whereabouts."
Sandra Walker testified that she had known the mother "all of her life" and had known the father "all of his school career." She stated that in addition to being an athletic trainer at the local high school, she also counseled teenage and unwed parents. She stated that she had advised the mother about placing the child for adoption and had facilitated the adoption. She stated that she did not consider the father or his family for an adoptive placement because she thought the father had rejected the mother and that he had denied being the father. She admitted that she did not discuss the pregnancy with the father and did not hear the father deny the child or say that he did not want the child.
The assistant principal at the high school the mother and father had attended stated that he either observed or was told that the mother was pregnant, because it was common knowledge that they had been dating, and that he had discussed the mother's possible pregnancy with the father. He stated that the father said during their one conversation that "she wasn't *121 pregnant" and that they did not discuss the issue again.
The main opinion concludes that the father's conduct, both during the mother's pregnancy and after the child's birth, amounted to abandonment. The Alabama Adoption Code, § 26-10A-1 et seq., Ala.Code 1975, contains the following relevant provisions:
"Section 26-10A-8. Consent or relinquishment by a minor parent.
". . . .
"(c) A minor father may give his implied consent by his actions. If a court finds by conclusive evidence that a minor father has given implied consent to the adoption, notice and the appointment of a guardian ad litem shall not be necessary."

__________
"Section 26-10A-9. Implied consent or relinquishment.
". . . .
"(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.
"(2) Leaving the adoptee without the provision for his or her identification for a period of 30 days.
"(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months.
"(4) Receiving notification of the pendency of the adoption proceedings under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days."
The "prebirth-abandonment" provision contained in § 26-10A-9, Ala.Code 1975, and cited in the main opinion did not exist when the mother became pregnant; it became effective only on June 11, 1999, 25 days before the child's birth. I therefore question the applicability of the statute in this case. I agree that there may be instances in which a parent's actions prior to the birth of the child may be considered as evidence of his or her consent to an adoption; however, in this case, the father's conduct beginning immediately after the child's birth overwhelmingly negates any finding of an intent to abandon the child or to give implied consent to the adoption. I further agree with the special writings of several of the Justices in Ex parte C.V., supra, that any implied consent may be withdrawn by the subsequent actions of a parent. Chief Justice Moore states, in part:
"A parent's conduct before the birth of the child can evince implied consent to an adoption. This was the case even before the 1999 amendment to § 26-10A-9 became effective on June 11, 1999. However, even if this Court were to assume that [the father] had impliedly consented to the adoption ..., § 26-10A-13, Ala.Code 1975, provides that an express consent can be withdrawn: [stating certain means for withdrawing it]. Express consent certainly communicates a clearer assent by a parent to an adoption than does implied consent. Logically, if a parent can withdraw express consent to an adoption, a parent can withdraw implied consent to an adoption."
C.V. at 703. Justice See's special concurrence states, in part:
"It is clear that a parent can expressly consent to the adoption of his or her child before the child's birth, see Ala.Code 1975, §§ 26-10A-11(2), 26-10A-13(a) *122 and (b). I see no reason a parent cannot also impliedly consent to a child's adoption before that child's birth. However, the Legislature has provided that, after the child's birth, a parent can withdraw his express prebirth consent to the child's adoption. See § 26-10A-13. If we are to recognize prebirth implied consent to adoption, then, I believe, consistent with the statutory structure for express consent and its withdrawal, we must also recognize implied withdrawal of prebirth consent."
C.V. at 705. As to the issue of abandonment, Justice Johnstone's special concurrence states, in part:
"Abandonment, as defined by the Child Protection Act, is
"`a voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.'
"§ 26-18-3(1)(emphasis added). This definition does not contemplate abandonment of an unborn child by a father, because a father cannot have custody of the unborn child. Simply put, § 26-18-7(a)(1) does not authorize a trial court to terminate parental rights for `prebirth abandonment' by a father. While the father's prebirth conduct towards the birth mother and his alleged lack of financial support of the birth mother could be relevant to his fitness as a parent, the father's prebirth conduct toward the birth mother was not relevant to whether the father abandoned [the child].... A fortiori, I agree with several of my colleagues on this Court insofar as they observe in their special writings that the evidence in this case cannot support the conclusion that any abandonment by the father `continue[d] for a period of six months next preceding the [prospective adoptive parents'] filing of the petition' (§ 26-18-7(c) quoted above) so as to terminate the father's parental rights, as the Child Protection Act would require for the termination of the father's parental rights."
C.V. at 723-24.
In S.W.B. v. R.C., 668 So.2d 835 (Ala.Civ.App.1995), this court approved an adoption of an infant, who was given to the adoptive parents by the biological mother and was subsequently reared by the couple for 12 years. We concluded in that case that the mother had failed to provide financial support, had not communicated with the child, and had failed to maintain a nominal parental relationship for the preceding seven years; therefore, the evidence supported "a finding of implied relinquishment" under § 26-10A-9, Ala.Code 1975, and we further held that the trial court's judgment terminating parental rights based on abandonment was due to be affirmed. Id. at 836-37. Our opinion stated, in part,
"Under the Alabama Adoption Code, § 26-10A-1 et seq., Ala.Code 1975, consent or relinquishment of the adoptee is implied when the parents `knowingly [leave] the adoptee with others without provision for support and without communication,' or when they `otherwise [do not maintain] a significant parental relationship with the adoptee for a period of six months.' § 26-10A-9(2), Ala.Code 1975. In short, the statute provides that relinquishment is implied when parents have knowingly abandoned their child. `Abandonment' is defined in the Code as
"`a voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the *123 child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.'
"§ 26-18-3(1), Ala.Code 1975. A trial court can terminate parental rights if it finds by clear and convincing evidence that the parents have, among other things, abandoned their children. M.H.S. v. State Dep't of Human Res., 636 So.2d 419, 421 (Ala.Civ.App.1994); § 26-18-7, Ala.Code 1975.
". . . .
"We could find no cases dealing with § 26-10A-9, Ala.Code 1975. However, the evidence in this case supports a finding of implied relinquishment of the child for adoption.... Therefore, we hold that, by implication, [the biological parents] relinquished [the child] for adoption; see § 26-10A-9, Ala.Code 1975. The trial court's judgment terminating the biological parents' parental rights and granting the adoption is due to be upheld. See, e.g., M.J.G.L. v. State Dep't of Human Res., 587 So.2d 1004 (Ala.Civ.App.1991).
". . . .
"... The Alabama Adoption Code, § 26-10A-1 et seq., [Ala.Code 1975], was adopted in 1990, replacing earlier law on the adoption of children, § 26-10-1 et seq., [Ala.Code 1975]. Because the Adoption Code is relatively new, there is little case law addressing its provisions. The Committee Comments to § 26-10A-9, dealing with implied consent of a parent for the adoption of his or her child, states:
"`Just as acceptance of the terms of a commercial contract can be implied from the conduct of a party, so may the consent of a person to the adoption be implied from the conduct of that individual. When it is not possible to obtain the actual consent of a person who is specified in § 26-10A-7, this section enumerates instances in which a person's consent may be implied from his or her acts or omissions with respect to his or her duty to care for the adoptee in the past.'"
668 So.2d at 836-38.
The main opinion discusses the father's failure to support the child and his failure to maintain contact or seek visitation with the child as a basis for terminating his parental rights. In this case, the trial court determined on January 5, 2000, that F.P. was the father; however, the trial court withdrew its order on January 19, 2000, and reset the case for a hearing to determine paternity. As in Ex parte C.V., it appears that the court established paternity for the father when it simultaneously terminated his parental rights. During testimony, the court commented on the father's ability to contribute to the child, stating, "I can understand when the man doesn't know where the child is that he can't send a gift or child support." The only contact the father had with the adoptive parents was by a telephone call. I also question the father's obligation to support the child once the prospective adoptive parents received the child into their home, filed a petition for adoption, and petitioned to terminate the father's parental rights. Justice Johnstone's special writing stated, in part:
"To penalize the father for failing to contribute to the prospective adoptive parents after they revealed themselves and [the child] but while they did their utmost to deny and to terminate the father's parental rights would be equally unfair.
"Additionally, once prospective adoptive parents have received an adoptee *124 into their home and have filed a petition for adoption, a court `shall [enter an interlocutory order] delegating to the [prospective adoptive parents] (1) custody, except custody shall be retained by... the licensed child placing agency which held custody at the time of the placement until the entry of the final decree and (2) the responsibility of the care, maintenance, and support of the adoptee, including any necessary medical or surgical treatment, pending further order of the court.' § 26-10A-18. Therefore, once the prospective adoptive parents petitioned to adopt [the child] they assumed responsibility for his care and support, and, thus, relieved the father of any duty of support."
810 So.2d at 722.
In T.S. v. J.P., 674 So.2d 535 (Ala.Civ.App.1995), we held that in order to terminate parental rights in a pending adoption case, the court must determine whether grounds for termination exist, including, but not limited to, those specifically listed in the Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, and must also determine whether all viable alternatives to termination of parental rights have been considered. We stated, in part:
"It follows, therefore, that Ala.Code 1975, § 26-10A-1 et seq., the Alabama Adoption Code (AAC) must be read in pari materia with Ala.Code 1975, § 26-18-1 et seq., the 1984 Child Protection Act (CPA).
". . . .
"In the CPA, our legislature clearly provided guidelines and standards for terminating parental rights based upon clear and convincing evidence. [§ 26-18-7, Ala.Code 1975.] Mindful of the serious nature of cases involving the termination of parental rights and the need to comply with the requirements of due process, our Supreme Court established a two-pronged test be to applied. Ex parte Beasley, 564 So.2d 950 (Ala.1990). The court must determine whether grounds for termination exist, including, but not limited to, those specifically listed in § 26-18-7, and must also determine whether all viable alternatives to the termination of parental rights have been considered.... Furthermore, where the State or a nonparent seeks to terminate parental rights, the court must find that the child is dependent. Additionally, we note that the United States Supreme Court has held that, in a termination of parental rights proceeding, a `clear and convincing evidence' standard of proof satisfies the requirements of due process, while a lesser standard does not.
"A construction of the AAC that usurps and overrides the CPA, and that calls for the application of a lesser or different standard, is an unworkable, unjust, and unreasonable interpretation. More importantly, the imposition of a lesser standard would clearly be unconstitutional."
Id. at 537 (citations omitted).
The father stated that he worked part-time and would contribute to the financial support of the child while he attended college. There was no testimony to indicate that he was unfit or unwilling to care for the child or that his circumstances would not change in the foreseeable future. He further stated that the mother had been pressured into the adoption because the child was biracial; that he wanted to rear the child within his family and the community, regardless of its mixed race, and that the child would live with his mother, so that he could continue his college education. I conclude that the father's conduct, including registering with the putative-father registry, promptly filing a petition for custody, and petitioning *125 the court to stop the adoption proceedings, indicates a willingness and desire to rear the child.
Last, the evidence does not support a finding that there are no viable alternatives to terminating his parental rights. There was ample testimony indicating that the paternal grandmother was a suitable relative resource to be considered as an alternative placement for the child. The trial court stated that the paternal grandmother was capable of caring for the child, and it made the same assessment of several other paternal relatives who testified.
Based on the foregoing and in light of the supreme court's recent holding in Ex parte C.V., I would reverse the trial court's judgment and award immediate custody of the child to the father and paternal grandmother. See also, G.D.M. v. State, 655 So.2d 1020 (Ala.Civ.App.1995).
CRAWLEY, J., concurs.
NOTES
[1] We note that § 26-10A-9, Ala.Code 1975, as amended effective June 11, 1999, was effective at the time of the child's birth. Even assuming that the previous Code section governing implied consent governed this action, we would note that the language of that section is similar to that set forth in the amendment.
[2] The record indicates that the child was born on July 6, 1999, which means that the father petitioned the juvenile court even before the child was born.