THOMPSON, Judge.
F.P. and R.P. (the “paternal grandmother”) appeal from a judgment that denied their joint petition for custody of F.P.’s minor child, terminated his parental rights to the child, and approved the adoption of the child by J.K.M. and S.L.M. (the “adoptive parents”).
On July 1, 1999, F.P. petitioned the juvenile court for a determination that he was the father of the child and for a stay of adoption proceedings that he said he believed were pending in the Crenshaw County Probate Court.
On July 12, 1999, the adoptive parents filed in the probate court a petition to adopt the child. On July 13, 1999, the probate court entered an interlocutory order awarding custody of the child to the adoptive parents, pending a dispositional hearing scheduled for December 1999.
In December 1999, F.P. filed a second motion in the juvenile court seeking to have his paternity of the child judicially determined; F.P. stated in that motion that paternity tests had established his paternity of the child. On January 5, 2000, the trial court entered an order determining him to be the biological father of the child. However, on January 19, 2000, the trial court, apparently ex mero motu, entered an order in which it set aside its January 5, 2000, order and scheduled a hearing to consider the issue of the paternity of the child.
On April 10, 2000, F.P. filed in the probate court a motion seeking to set aside the adoption proceedings and the order awarding the adoptive parents custody of the child. On April 20, 2000, the probate court transferred the pending adoption action to the juvenile court.
*112 Also on April 10, 2000, F.P. and the paternal grandmother filed in the juvenile court an “amended petition for custody,” in which they sought joint custody of the child. On April 14, 2000, the adoptive parents petitioned to terminate F.P.’s parental rights.
The juvenile court (hereinafter the “trial court”) conducted an ore tenus hearing on April 28, 2000. On September 8, 2000, the trial court entered a judgment that, among other things, terminated F.P.’s parental rights, denied F.P. and the paternal grandmother’s joint petition for custody of the child, and granted the adoptive parents’ petition to adopt the child. F.P. and the paternal grandmother appealed.
The facts are as follows: The minor child, who was born on July 6, 1999, is biracial. B.S., the child’s mother, and F.P. were both 17 years old and attended the same high school at the time of the child’s birth. The mother and F.P. had dated while in high school, but they were unable to date “openly” because the mother’s family did not approve of the relationship. The mother testified that her mother had asked her to leave home after she became pregnant, at least in part because she had become pregnant by a person of another race.
The mother testified that in October 1998 she told F.P. that she was pregnant and that after that she and F.P. did not continue to date. The mother testified that she “[did not] know” what happened to the relationship, only that, after she informed F.P. of her pregnancy, “[they] just stopped seeing each other.” It is undisputed that after learning of the mother’s pregnancy, F.P. offered the mother no emotional or financial support and made no effort to contact her.
The paternal grandmother took the mother to two prenatal medical appointments. The mother testified that, at the paternal grandmother’s request, she wrote a letter stating that she wanted the paternal grandmother to have custody of the baby after it was born. The mother testified at the April 2000 hearing that she thought the child’s best interests would be served by living with the adoptive parents.
At the time of the hearing, F.P. was attending college 150 miles from his family’s home and had a part-time job at which he earned $300 per month. He testified that his mother provided the majority of his support. He returns to his mother’s home on weekends.
F.P. testified that he had never seen the child. He and the paternal grandmother went to the hospital to visit the child after its birth. The paternal grandmother testified that they were unable to see the child because the child was not “available” because he had just been returned to the nursery. F.P. testified that he made no further attempt to see or visit the child, and he did not ask the mother about the child. When asked why he did not attempt to see, or inquire about, the child, F.P. responded by saying he “[didnot] know.”
The adoptive parents took the child home from the hospital. F.P. testified that he first learned three weeks after the child’s birth that the mother did not have custody of the child. F.P. testified that another two weeks passed before he spoke with the mother about the child; he admitted that the mother had contacted him on that occasion.
The adoptive parents’ home address is listed in the petition for adoption. Other information, such as their home and work telephone numbers and directions to their home, is contained in the documents filed in support of the adoption petition. Although F.P. admitted that he knows the name of the Florida town in which the *113 adoptive parents and the child live, he testified he does not know where in Florida that town is located.
Further, F.P. made no attempt to contact the adoptive parents until the Saturday before the hearing. At that time, he telephoned the adoptive parents’ home and spoke to a relative who was babysitting the child. F.P. testified he asked the relative if he could come see the child, and the relative answered “no.” F.P. testified that he made no further attempt to contact the adoptive parents, and, when asked why he did not call back to speak with the adoptive parents, he responded, “I don’t know.”
F.P. testified that he did not provide support for the mother during the pregnancy because she did not ask for support; he also testified that he had not provided any support during the time the child has been in the custody of the adoptive family because the adoptive family did not request such support. We note that at no time during his contest of the adoption proceedings did F.P. ask a court to determine a child-support obligation or make an offer to pay some amount of child support into the court. The mother and the adoptive parents have been the sole providers of support for the child.
F.P. has another child by his current, 16-year-old girlfriend. He stated that he was providing financial and emotional support for the mother of that child. The mother of that child testified that F.P. gave her money “if I needed it,” but she admitted on cross-examination that F.P. had not given her as much as $50 in support for her child.
F.P. testified that he wanted custody of the child “[b]ecause he is my son. I do not want anyone else raising him. I think it is in [the child’s] best interests [that] he be with his natural father, not someone else.” However, it is undisputed that F.P. wants the child to live with the paternal grandmother while F.P. attends college in a town over 150 miles from his mother’s home. F.P. testified that if he had the child he would see the child on weekends. The paternal grandmother’s sister and a cousin testified that, if F.P. was awarded custody of the child, they were willing to care for the child while the paternal grandmother worked.
The paternal grandmother testified that she would like to have custody of the child, and, in the alternative, that she would take care of the child for F.P. while he attends college. The paternal grandmother testified that she works, but that one of her cousins or a neighbor could take care of the child during the day while she is at work. Both the cousin and the neighbor testified they were willing to care for the child while the paternal grandmother was at work. F.P.’s siblings testified that they were willing to support F.P. financially and assist him with the child; they did not seek custody or offer to take the child.
Teresa Saunders, a social worker for the Department of Human Resources, testified that the probate court asked her to complete a report in conjunction with the petition for adoption. Saunders testified that she was asked to obtain information regarding the medical and social histories of the child’s natural parents. Saunders testified that she interviewed the mother and obtained the requested information from her, but that the mother informed her that she did not know the whereabouts of the child’s father.
Sandra Walker, a clinical specialist who counseled the mother during her pregnancy, testified that she had known the mother for all of the mother’s life and that she had known F.P. during his “school career.” Walker testified that she counseled the mother during her pregnancy while the mother considered her available options. *114 Walker was the mother’s counselor; therefore, she testified, it was not appropriate for her to attempt to counsel F.P.
Walker facilitated the adoption of the child through the Christian Adoption Agency. Walker testified that she did not consider F.P. or his family for an adoptive placement for the child because she believed F.P. had rejected both the mother and the baby. The mother reported to Walker that F.P. had rejected her, and Walker had witnessed an incident in which she said F.P. had rejected and “shunned” the mother.
Walker also testified that in spring 1999, before the birth of the child, the mother, her mother and uncle, F.P., the paternal grandmother, and the parties’ attorneys met with her and a representative of the adoption agency to discuss the mother’s plan to place the child for adoption. Walker testified that neither F.P. nor his mother indicated that his family should be explored as a possible placement for the child; that nobody at the meeting raised an issue as to whether the adoption should proceed; and that after the meeting, she believed she had no reason to discontinue the adoption process.
The adoptive parents each testified that they had a loving relationship with the child. They described their home, their financial ability to care for the child, and the support they receive from their friends and the members of their church.
The trial court’s judgment stated, in part:
“The Court having considered all of the evidence presented ore tenus, arguments of counsel, and having read and studied briefs filed on behalf of [the adoptive parents] and [F.P.], having consulted in chambers with the guardians ad litem for the minor child and both minor parents, and subsequent thereto having consulted in chambers with the guardian ad litem for the child, the Court is satisfied from clear and convincing evidence adduced that the facts alleged in the petition for adoption are true; that the adoptee has been in the actual physical custody of the petitioners for a period of sixty (60) days or more; that the petitioners are suitable to be the parents of said adoptee and that they desire to establish a parent/child relationship with the adoptee; that the evidence clearly supports [a finding] that [F.P.] has impliedly consented or relinquished his parental rights pursuant to Section 26-10A-9, Ala.Code 1975, and further that his parental rights should be terminated pursuant to Section 26-18-7, Ala.Code 1975; that the best interest of the adoptee will be served by granting the petition to adopt, and that a change of name of the adoptee and a change of guardianship to the [adoptive parents] is proper.”
On appeal, F.P. first argues that the trial court erred in determining that he had impliedly consented to the adoption of the child. Section 26-10A-9, Ala.Code 1975, governs implied consent to an adoption or voluntary relinquishment for adoption.
“A consent or relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent:
“(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.
“(2) Leaving the adoptee without provision for his or her identification for a period of 80 days.
“(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not *115 otherwise maintaining a significant parental relationship with the adoptee for a period of six months.
“(4) Receiving notification of the pen-dency of the adoption proceeding under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days.”
§ 26-10A-9, Ala.Code 1975.[1]
The appellants argue that, because F.P.’s paternity was not established before the child’s birth, he was not a “parent” of the child who owed any rights or duties to the child, and therefore, that his prebirth conduct toward the child’s mother could not constitute implied consent to the adoption pursuant to § 26-10A-9, Ala. Code 1975. We cannot agree. Further, the appellants did not raise this issue before the trial court. An appellant may not raise an issue for the first time on appeal; this court may not consider a theory or issue not pleaded or argued before the trial court. Abbott v. Hurst, 643 So.2d 589 (Ala.1994); Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313 (Ala.1992); Smith v. Equifax Servs., Inc., 537 So.2d 463 (Ala.1988). F.P. has not demonstrated that the trial court erred in its application of § 26-10A-9, Ala.Code 1975.
The next issue raised in the appellants’ brief on appeal is whether the evidence in the record supports the trial court’s termination of F.P.’s parental rights. The trial court’s finding that F.P.’s conduct amounted to an implied consent to the adoption, pursuant to § 26-10A-9, Ala. Code 1975, is sufficient to support the judgment approving the adoption, see §§ 26-10A-7 and -9, Ala.Code 1975, and we affirm the judgment on that basis. However, out of an abundance of caution, we address F.P.’s argument regarding the termination of his parental rights pursuant to § 26-18-7, Ala.Code 1975.
Every parent has a prima facie right to custody of his or her child, and that right can be overcome only by a showing of clear and convincing evidence indicating that removing the child from the parent’s custody would be in the best interests of the child. M.H.S. v. State Dep’t of Human Res., 636 So.2d 419 (Ala.Civ.App.1994). On appeal, the trial court’s termination of a parent’s parental rights is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. Id. The paramount consideration in a proceeding to terminate parental rights is the best interests of the children involved. A.R.E. v. E.S.W., 702 So.2d 138 (Ala.Civ.App.1997).
In its judgment, the trial court stated that it found, through clear and convincing evidence, that F.P.’s parental rights should be terminated pursuant to § 26-18-7, Ala. Code 1975. That section reads: *116 parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:

*115
“Grounds for termination of parental rights; factors considered; presumption arising from abandonment.

“(a) If the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the
*116 “(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for the needs of the child;
“(3) That the parent has tortured, abused, cruelly beaten or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling;
“(4) Conviction of and imprisonment for a felony;
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent;
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
“[certain named offenses]
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
“(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
“(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a re-buttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period.”
§ 26-18-7, Ala.Code 1975.
The evidence in the record makes it clear that F.P. provided the mother of his *117 child no emotional, financial, or other form of support during her pregnancy. He attended a meeting at which the mother’s plan to place the child for adoption was discussed; Walker (the counselor) testified that neither F.P. nor any member of his family objected at that meeting to placing the child for adoption. After the child was born, F.P. made no inquiries about the child. He testified that he first learned, three weeks after the child’s birth, that the child was with the adoptive parents and that he obtained that information from his mother. The adoption petition contained all necessary identifying and contact information regarding the adoptive parents. F.P. made no effort to contact the adoptive parents. He answered “I don’t know” when asked why he had made no effort to inquire about the child or to contact the adoptive parents. The appellants state in their brief on appeal that the adoptive parents “prevented” F.P. from developing a relationship with his son. The record does not support that assertion. Since July 12, 1999, F.P. has had all of the information necessary to contact the adoptive parents regarding the child. F.P.’s first attempt to contact the adoptive parents occurred on the Saturday before the April 28, 2000, hearing in this matter. As a result of F.P.’s attempt to contact them immediately before the hearing, the adoptive parents asked their attorney to send F.P.’s attorney a letter indicating that they “would prefer” not to have contact with F.P.; their attorney sent such a letter, dated April 25, 2000 — three days before the hearing in this matter. It cannot be said that that letter prevented F.P. from making an attempt to contact the adoptive family during the 10 months in which the child was in their custody before F.P. made his only effort to contact them. We note that the adoptive parents testified that they were willing to have future contact with the mother, but that, because F.P. was contesting their adoption of the child, they were unsure whether they wanted to have contact with him in the future.
In his brief to this court, F.P. attributes his failure to offer any support for the child to his “poverty.” He cites In re Hickman, 489 So.2d 601 (Ala.Civ.App.1986), for the proposition that in the absence of abuse or a lack of caring, poverty is not a reason to take a child from his parents. However, at trial, F.P. did not state that he was unable to provide support for the child. He testified that he did not provide any support to the child’s mother because, he says, she did not ask for any support. He testified that if he had had an “open relationship” with the adoptive parents, then he would have offered and provided support for his child. However, F.P. made no effort to seek any relationship with the adoptive parents, until only days before the hearing. During his only attempt to contact the adoptive parents, F.P. spoke with a relative who he believed was just a babysitter; F.P. made no additional effort to contact, or to speak with, the adoptive parents.
Further, F.P. sought custody of the child, but stated that if awarded custody, the child would not live with him, but, rather, would be reared by F.P.’s family while F.P. continues his college education in a town 150 miles from his family’s home. The record clearly demonstrates that F.P. has made no effort to adjust any aspect of his life to accommodate the needs of the child.
In his brief on appeal, F.P. discusses the questions whether the court had viable alternatives to the termination of his parental rights, by stating only that “he has presented the court with viable alternatives to his son being adopted, namely that of having his entire familyt’s] support pending his completion of college.” Thus, *118 F.P. argues on appeal only that an award of custody to him is the viable alternative to the termination of his parental rights.
We conclude that the record demonstrates that F.P.’s conduct amounted to an abandonment of the child and that his conduct toward the child, both before and after its birth, contradicts the position he has taken in this legal proceeding. The record also demonstrates that F.P. had failed to offer any form of support for the child, and that he had failed to maintain any contact, or to seek visitation with, the child. See § 26-18-7, Ala.Code 1975.
We conclude that the trial court’s judgment is supported by the evidence in the record and that the judgment is not plainly and palpably wrong. See A.R.E. v. E.S.W., supra; M.H.S. v. State Dep’t of Human Res., supra. The judgment is affirmed.
AFFIRMED.
PITTMAN, J., concurs.
MURDOCK, J., concurs in the result.
YATES, P.J., and CRAWLEY, J., dissent.

. We note that § 26-10A-9, Ala.Code 1975, as amended effective June 11, 1999, was effective at the time of the child's birth. Even assuming that the previous Code section gov-eming implied consent governed this action, we would note that the language of that section is similar to that set forth in the amendment.